# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | |
|---|---|
| **DAVID MEYERS,** ) | Civil Action No. 7:18cv00029 |
| Plaintiff, ) | |
| ) | |
| v. ) | **REPORT AND RECOMMENDATION** |
| ) | |
| **M. L. COUNTS, et al.,** ) | By: PAMELA MEADE SARGENT |
| Defendants. ) | UNITED STATES MAGISTRATE JUDGE |

David Meyers, ("Meyers"), a Virginia Department of Corrections, ("VDOC"), inmate proceeding pro se, brings this civil rights action against two VDOC employees of Red Onion State Prison, ("Red Onion"), under 42 U.S.C. § 1983. By Opinion And Order entered July 23, 2018, the court allowed Meyers to proceed only on his claim that Defendants W. Swiney and D. C. Stallard have violated his rights under the Eighth Amendment by not protecting him from an excessive risk that fellow Red Onion inmates W. Thomas and J. Runren will carry out threats to rape or kill him.

Because at least three of Meyers's previous complaints have been dismissed with prejudice for failing to state a claim upon which relief may be granted under 28 U.S.C. § 1915A(b)(1), Meyers may not proceed with this action unless he pays the filing fee or shows that he is under "imminent danger of serious physical injury." 28 U.S.C.A. § 1915(g) (West 2006). This matter is before the undersigned magistrate judge by referral, pursuant to 28 U.S.C. § 636(b)(1)(B), to conduct an evidentiary hearing to determine if Meyers was under imminent danger of serious

-1-

physical injury at the time he filed this action. *See Martin v. Shelton*, 319 F.3d 1048, 1050 (8th Cir. 2003). Evidentiary hearings were conducted on August 16 and 24, 2018. The undersigned now submits the following report recommending that the court find that Meyers was under imminent danger of serious physical injury at the time that he filed this action.

## I. Facts

By Complaint filed with the court January 1, 2018,[1] Meyers alleged, among other claims, that Defendants Swiney and Stallard were inadequately protecting him from fellow inmates Thomas and Runren, who have threatened to sexually assault and kill Meyers.[2]

Meyers testified at both evidentiary hearings. At the August 16, 2018, hearing, Meyers testified that he was housed in the Protective Custody Unit in the C6 Pod at Red Onion. Meyers said he was housed in cell 111, a handicapped cell. Meyers said that, prior to January 19, 2018, he was housed in the Protective Custody Unit in the D1 Pod in cell 120, which also was a handicapped cell. Meyers said that he had been shot nine times in his life and had suffered severe back and neck injuries in a motor vehicle accident in 2015. Meyers said that he could no longer stand unassisted and was confined to a wheelchair. He said he had totally lost the use of his legs since he had been housed at Red Onion. Meyers also stated

---

[1] The envelope containing Meyer's Complaint is postmarked January 1, 2018. (Docket Item No. 1 at 4.)

[2] *See* the Hon. James P. Jones's July 23, 2018, Opinion And Order, (Docket Item No. 48), at 10 n.4, adding Stallard as a party to Meyers's claim.

that he was visually impaired because of a previous stab injury to an eye and an optic nerve disease.

Meyers testified that Defendant Swiney had threatened to transfer him out of the Protective Custody Unit on several occasions. He said that on June 19, 2017, Swiney told him, "If we want you dead, you're dead." Meyers said that on June 28, 2017, inmate Runren threatened to rape and kill him. He said that Runren was housed on the lower tier of the Protective Custody Unit at that time. He said that inmates housed on the same tier of the Unit participated in indoor and outdoor recreation together. Meyers said that he wrote Red Onion Assistant Warden Kiser and told Swiney about the threat, but that nothing was done to protect him from Runren.

Meyers said that he was on the D1 Pod recreation yard on August 17, 2017, when Thomas told him, "I am going to put my hand up your ass." Meyers said that Thomas does not like white people, and he believes that Thomas was mad because Meyers, an African American, was talking at the time to a white inmate. Meyers said that Thomas yelled, "I will kill you. I will kill you. I will kill your ass." Meyers said that he wrote numerous letters reporting this threat and asking that the surveillance video of the recreation yard on that day be reviewed.

Meyers said that, since this incident in August, Thomas and Runren had threatened him daily. Meyers stated that he had filed numerous request forms regarding the threats, including a request form to Swiney sent the day of the incident, August 17, 2017. Meyers said that Swiney did talk with him and his personal care assistant after the incident. After that, he said that Thomas was

moved to a top tier cell. Meyers said that Thomas was placed on the bottom tier again in September 2017 and that he had been in and out of bottom tier cells after returning to the Unit from segregation.

Meyers said that Thomas threatened him again on August 8, 2018, by saying, "I'm going to flip you out of your wheelchair." Meyers said that on August 10, 2018, officers opened his cell door for pill call while Runren was participating in inside recreation. He said that Runren told him, "Come on out of your cell. I'm going to stomp your ass." He said that his cell door was opened for pill call while the top tier was taking inside recreation every day that Defendant Stallard worked. He said that, on occasion when this is done, there are no correctional officers in the pod to prevent these inmates from coming into his cell.

Meyers stated that, if the bottom tier cell doors are opened during top tier recreation, the top tier inmates are supposed to line up and remain in line until the bottom tier cell doors are closed. He said, however, that some officers do not require this. Meyers said that on the Friday before the first hearing, his cell door was opened while Runren and Thomas were participating in inside recreation. Meyers said that neither of the inmates entered his cell, but he said that they stood about 12 feet from his cell, yelling at him to come out of his cell.

Meyers also testified that he was in his cell with the cell door open for pill call on July 31, 2018, while the top tier inmates were returning from outside recreation.

-4-

Meyers testified that the Protective Custody Unit was moved from the D1 Pod to the C6 Pod on July 31, 2018. He said that Swiney worked as Unit Manager of the D Building, but not the C Building. He also said that Defendant Stallard worked in the D1 Pod, but did not work in the C6 Pod.

At the August 24 hearing, Meyers testified that he wrote numerous letters to Red Onion Assistant Warden Kiser about the threats made to him by Thomas and Runren. He said that he called the PREA, ("Prison Rape Elimination Act'), hotline numerous times to report Runren's threats of sexual assault.  Meyers said that he has filed "dozens" of complaints about Runren's and Thomas's threats and that no one associated with Red Onion has investigated his claims. He said that Runren had made threats to rape him since June 28, 2017.  He said that these threats continued through the date that he filed his Complaint in this case, and continued. Meyers also testified that Runren was moved back and forth between the bottom and top tiers of the Unit, but was being housed on the bottom tier around the time that Meyers filed his Complaint.

Meyers also testified that he had been required to travel through the pod to offices for hearings and meetings when the top tier inmates were out of their cells. He said that officers did not always escort him on these occasions.  Meyers admitted, however, that he could not recall this occurring on any occasion from August 2017 to January 2018.

Meyers also submitted into evidence a copy of a Regular Grievance, dated November 22, 2017, that he mailed to the VDOC Regional Office. (Plaintiff's Exhibit No. 9, Docket Item No. 64-9.) This Grievance complained that Meyers had

been placed on restriction from filing additional grievances on November 22, 2017. The Grievance also stated that inmate Runren had made several sexually harassing and sexually predatory statements to Meyers and specifically requested to be separated from Runren. This Regular Grievance was returned to Meyers with a notation to file it at Red Onion. Meyers submitted other Grievance forms that he said he had submitted to various VDOC officials. (Plaintiff's Exhibit Nos. 10, 11, Docket Item Nos. 64-10, -11.) These Grievances show that Meyers continued to complain of the threats made to him by Thomas and Runren after he had filed his Complaint with this court.

Meyers also submitted into evidence a number of letters to and from T. Harvey, Manager of the VDOC Ombudsman Service Unit. (Plaintiff's Exhibit No. 16, Docket Item No. 69-2.) The letters to Harvey, dated between January 9 and 19, 2018, all complained of continuing threats by Thomas and Runren to rape or kill Meyers. It appears that Harvey returned all of these letters to Meyers with instructions to pursue his administrative remedies at Red Onion.

Meyers submitted a number of other exhibits into evidence at his hearings, including video recording from the prison surveillance system recorded on August 17, 2017, and July 28, 2018. If not specifically referenced in this Report, it is because the undersigned found that these exhibits contained no evidence relevant on the issue before the court.

Red Onion inmate Lionel Melvin Carter testified that he worked as Meyers's personal care assistant. As Meyers's care assistant, Carter said that he pushed Meyers's wheelchair to meals and outside recreation, brought Meyers his meal

trays and assisted Meyers with showering. He said that both he and Meyers were "bottom tier" inmates.

Carter testified that he was present on the Red Onion recreation yard in August 2017, when he heard inmate W. Thomas, who is known to Carter by the name of "Ali," threaten to "f" Meyers up. Carter admitted that he was not sure of the exact date on which this occurred. Carter said that he spoke to Defendant Swiney, who was the Unit Manager of the Protective Custody Unit at that time, and to a prison investigator soon after the incident.

Carter testified that Thomas had made threats toward him in the past. Carter stated that both Thomas and Runren were routinely "trash talking" toward Meyers, but he could not remember any other specific threats aimed at Meyers. Carter also testified that Thomas had assaulted other inmates in the Protective Custody Unit in the past. Carter stated that he had no knowledge of Thomas ever sexually assaulting another inmate. Carter said that he had never heard Runren threaten Meyers or any other inmate.

Carter stated that he, Meyers, Thomas and Runren were all housed in the Protective Custody Unit at Red Onion. He stated that the Protective Custody Unit previously had been housed in the D1 Building and since being housed in the C6 Building, the correctional officers had opened the door to Meyers's bottom tier cell for pill call while inmates Thomas and Runren were out of the their top tier cells taking inside recreation. Carter stated that, when this was done, the inmates participating in recreation were required to line up on a line in the middle of the pod and remain there until pill call ended. He said that he had never seen Thomas

or Runren restrained in any way, nor had he ever seen a canine unit present, when the bottom tier cell doors were opened during top tier indoor recreation.

Carter stated that, at the time of the August 2017 threat against Meyers, Thomas was housed in a bottom tier cell. He stated that Thomas was moved to a top tier cell at some point after Carter spoke to Swiney about the incident. Carter did state that Thomas was placed in segregation after assaulting another inmate earlier this year. When Thomas was released from segregation housing and returned to the Protective Custody Unit, Carter said, Thomas was placed in a bottom tier cell. Carter said that all inmates on the same tier participate in recreation, whether indoors or outdoors, at the same time.

Red Onion inmate Randy Taylor also testified that he heard Thomas, who he called "Ali," threaten Meyers on the recreation yard in mid-August 2017. Taylor said that he was walking laps around the recreation yard when he saw two inmates at the fence yelling at Meyers. He said that Thomas told Meyers he was going to stick his finger up Meyers's rectum. Taylor said that, subsequent to this incident, he spoke to a number of Red Onion officials, including Defendant Swiney.

Taylor testified that it was "not uncommon" for inmate Runren to make threats toward other inmates. In fact, Taylor said that Runren had threatened to kill him in the past. He said that both Thomas and Runren remained housed in the Protective Custody Unit at Red Onion. Taylor testified that he had known of Thomas being housed on the same tier as Meyers on several occasions since the August 2017 incident. He said that Thomas had been placed on the bottom tier on

four or five occasions after returning to the Protective Custody Unit from segregation.

Taylor testified that inmates Thomas and Runren and others were constantly threatening other inmates in the Protective Custody Unit, including Meyers. He said that these inmates would come to his cell and threaten him by stating what they would do to him if they could gain access to his cell. Taylor also said that these inmates would yell for the officer in the control booth to open his cell door so they could get to him. Taylor said that he has seen these same inmates at Meyers's cell door, but his cell was too far away from Meyers's cell to hear what they were saying to Meyers. Taylor said that he has asked to be kept separate from these inmates. He said that he was assaulted by one of these inmates, Ridings, after he had reported that Ridings had threatened him on numerous occasions. He said that he told Defendant Swiney about Ridings's threats several times before Ridings assaulted him. He said that Swiney told him he was just being "paranoid."

Taylor also confirmed that the doors of the bottom cell tiers would be opened "from time to time" while the top tier inmates were participating in inside recreation. He said that this happened routinely when the Protective Custody Unit was housed in the D1 Building. While Taylor acknowledged that the inmates participating in recreation are ordered to line up and remain there while the bottom tier doors are open, he said that there was nothing in place to prevent one of these inmates from leaving the line and going into an open cell.

Red Onion inmate Vincent "Vinnie" Chand testified that he witnessed Thomas threaten Meyers in August 2017, although he did not recall the exact date

on which it occurred. He said that Thomas was always antagonizing Meyers and ridiculing him over being in a wheelchair. Chand said that he heard Thomas tell Meyers, "I'm going to finish the job and kill you." He said that Thomas also threatened to sexually assault and stab Meyers.

Chand said that, when the Protective Custody Unit was housed in the D1 Pod, he was housed in cell 19 beside Meyers in cell 20. He said that he "routinely" would hear Thomas tell Meyers that he was going to run in Meyers's cell and "get" him. Chand said that he was no longer housed beside Meyers since the Unit had moved to the C6 Pod, but he said that he had heard Thomas threaten Meyers on the recreation yard within the previous week. He said that he heard Thomas tell Meyers they were going to "jump him" when he came out of his cell to receive his medication. He said that he had not ever heard Runren threaten Meyers. Chand testified that both inmates Thomas and Runren were violent and disruptive. He said that both of these inmates had made threats toward him. Chand said that Thomas had assaulted him on February 21, 2018.

Chand said that he had witnessed the doors of the bottom tier cells opened for pill call on occasion while the top tier was participating in inside recreation. He did say that, when this occurred, the inmates who were participating in recreation were supposed to remain lined up, but he also said that there was nothing present to prevent the inmates from leaving the line. He said that he has never seen a canine unit present in the pod when this occurs or any inmates ever restrained. Chand also said that he had witnessed all the cell doors, both bottom and top tiers, open at the same time for pill call.

Red Onion Assistant Warden Jeffrey Artrip also testified at the August 16 hearing. Artrip testified that the top and bottom tier inmates housed in the Protective Custody Unit at Red Onion were supposed to be kept separate. Artrip did concede that, on occasion, bottom tier cells in the Protective Custody Unit would be opened for pill call while the top tier inmates were participating in inside recreation. Artrip said that, when this occurs, the inmates participating in recreation are supposed to remain lined up in the center of the pod until the bottom tier cell doors close. He said that the correctional officers present in the pod and the gun officer in the control booth ensure that this occurs. He said that he was not aware of any attacks ever happening while pill call was conducted in this manner. Artrip confirmed that neither Defendant Swiney, nor Stallard work in the C6 Pod.

Artrip conceded that he had received numerous complaints from Meyers about inmates Thomas and Runren, but he said these incidents had been "ruled unsubstantiated." Artrip also confirmed that there had been no "keep separate" order entered to keep Thomas or Runren separate from Meyers. However, Artrip stated that he did not know if Meyers had ever requested to be kept separate from Thomas or Runren. When asked to review a July 23, 2018, Grievance Receipt Report showing that Meyers had filed a Grievance on this date complaining that Runren and Thomas had made death threats against him, (Plaintiff's Exhibit No. 4, Docket Item No. 64-4), Artrip stated that Red Onion staff should have given Meyers a form to fill out to request to be kept separate from these inmates. Artrip did state that placing inmates on different tiers in a unit would comply with a keep separate order, if one had been entered.

Artrip also testified that, if Meyers did not want his cell door opened for pill call, he should have addressed that concern to the Head Nurse.  Artrip then testified that Plaintiff's Exhibit No. 5 appeared to be an Offender Request form from Meyers to the Medical Department asking that he be allowed to self-medicate because he did not want his cell door opened for pill call due to the threats of other inmates, including Runren and Thomas. (Plaintiff's Exhibit No. 5, Docket Item No. 64-5.) The response on this form stated that the Medical Department would not let Meyers self-medicate because he was not compliant with his medications. (Plaintiff's Exhibit No. 5, Docket Item No. 64-5.)

Artrip conceded that Informal Complaint form ROSP-18-INF-01295, filed by Meyers on July 23, 2018, stated:

> This is the 5th unresolved, unanswered, unreceipted grievance that I have filed on ROSP Unit Manager, ICA, and Investigators still housing me in the same unit with inmates J. Runren, W. Thomas, … so they can retaliate on me for reporting their sexual abuses, death threats they have made to me. …

(Plaintiff's Exhibit No. 6, Docket Item No. 64-6.) Defendant Swiney responded on July 26, 2018: "You are housed safely and securely. The allegations you've claimed against the offenders listed in this complaint have been investigated and [determined] non-PREA."

Through Kiser's testimony, Meyers also submitted into evidence an Informal Complaint, dated November 2, 2017, and a Regular Grievance, dated November 20, 2017. (Plaintiff's Exhibit No. 3, Docket Item No. 64-3.)   This

Complaint and Grievance both complain of an incident in which, Meyers claimed, Runren repeatedly struck the back of his wheelchair. Both also referenced that Runren was a sexually dangerous predator who had threatened to sexually assault Meyers. (Plaintiff's Exhibit No. 3, Docket Item No. 64-3.) The Grievance specifically requested that Runren be kept separate from Meyers. (Plaintiff's Exhibit No. 3, Docket Item No. 64-3 at 1.) Defendant Swiney responded to the Informal Complaint and stated that the video footage did not support Meyers's accusations against Runren. (Plaintiff's Exhibit No. 3, Docket Item No. 64-3 at 3.) Meyers's Grievance was rejected at intake for stating more than one issue. (Plaintiff's Exhibit No. 3, Docket Item No. 64-3 at 2.)

Defendant Correctional Officer Dustin Stallard testified that, in January 2018, he was working the Protective Custody Unit housed in the D1 Pod at Red Onion. Stallard said that he still works the D1 Pod, but the Protective Custody Unit had been moved to the C6 Pod at Red Onion. Stallard stated that pill call normally occurred with a nurse going from cell to cell to pass out medication. Nonetheless, he conceded that, on occasion, inmates from one tier would be participating in inside recreation when the cell doors for the other tier would be opened for inmates to travel to the pod vestibule for pill call. He also conceded that, during this time, the inmates taking recreation were not restrained in any way. He also said that officers working the pod had no weapons other that OC pepper spray and that there were no canine units present when this occurred.

Stallard testified that he had never heard Thomas or Runren threaten Meyers. He also testified that he could not recall Meyers ever complaining about Thomas and Runren threatening him. Stallard said that he could not recall if

-13-

Runren had ever been placed in a bottom tier cell after returning to the Protective Custody Unit from segregation. He said that he did recall that Thomas was placed in a bottom tier cell for a "very short time" on one occasion in either March or April 2018.

Defendant Walter Swiney also testified that he was the Unit Manager over the D1 Pod at Red Onion. Swiney said that, in August 2017, the Protective Custody Unit was housed in the D1 Pod at Red Onion. He said that the Unit had been housed in the C6 Pod since August 1, 2018. Swiney stated that, when cell doors are opened for pill call during inside recreation, the inmates participating in recreation are ordered to line up and remain lined up. He said that these inmates were under the constant sight supervision of the gun officer in the control booth. He conceded that inmates participating in recreation are not placed in restraints, floor officers are not armed and no canine officers are present when this occurs. He said there had never been an incident where an inmate participating in inside recreation had attacked an inmate who was out of his cell for pill call. He also said that a bottom tier inmate's door would not be opened for pill call during recreation if there was a keep separate order in place to keep the inmate separate from an inmate housed on the other tier.

Swiney stated that there is a formal process an inmate must go through to receive a keep separate order. Swiney said that Meyers has never requested the paperwork to complete to be kept separate from inmates Thomas or Runren. Swiney stated that he had never heard inmates Thomas or Runren threaten Meyers, nor had he ever seen them take any threatening action toward Meyers. He said that no other inmates had ever complained to him about Thomas or Runren.

Swiney stated that that he had investigated the August 2017 incident between Thomas and Meyers, and he took action to separate the two inmates by placing them on different tiers. Swiney conceded, however, that Meyers had been informing him about threats made by Thomas since at least March 2018. He also said that Meyers had made an "uncountable" number of complaints alleging that Runren had threatened to rape him beginning sometime in 2017. He said that he had taken action to place Runren on a different tier, also.

Swiney stated that a floor officer, such as Defendant Stallard, was not responsible for opening cell doors. Instead, he said that the officer working the control booth opened cell doors. Swiney testified that he did recall that inmate Thomas was placed on the bottom tier with Meyers on one occasion when released from segregation, but he said that Thomas was moved to a top tier cell later that same day. Swiney later conceded that he had placed Thomas in cell D-110, on the same tier with Meyers, earlier in 2018 despite knowing of Meyers's complaints about Thomas.

## *II. Analysis*

As stated above, the court has determined that at least three of Meyers's previous complaints have been dismissed with prejudice for failing to state a claim upon which relief may be granted under 28 U.S.C. § 1915A(b)(1). Therefore, under the Prison Litigation Reform Act, ("PLRA"), Meyers may not proceed with this action unless he pays the filing fee or shows that he is under "imminent danger of serious physical injury." 28 U.S.C.A. § 1915(g) (West 2006). To prove that he

is under imminent danger of serious physical injury, an inmate must show that the

> "… conduct complained of threatens continuing or future injury, not whether the inmate deserves a remedy for past misconduct." *Martin v. Shelton*, 319 F.3d 1048, 1050 (8th Cir. 2003). Vague, speculative, or conclusory allegations are insufficient to invoke the exception of §1915(g); rather, the inmate must make "specific fact allegations of ongoing serious physical injury, or of a pattern of misconduct evidencing the likelihood of imminent serious physical injury." *Id.*

*Johnson v. Warner*, 200 F. App'x 270, 272 (4th Cir. 2006).

Accordingly, based on the above evidence, I recommend that the court find that Meyers was in imminent danger of serious physical injury at the time that he filed his Complaint and grant his request for IFP status for this action. In particular, Meyers has offered evidence that he has been threatened continually by Thomas and Runren since approximately June 2017 and continuing. He has testified that these inmates have threatened to sexually assault, rape and kill him. Inmate witnesses Carter, Taylor and Chand offered testimony corroborating one or more of these threats against Meyers. Each of these inmates also testified that Thomas or Runren, or both of them, had threatened him harm previously. Each of these inmates testified that either Thomas or Runren had assaulted other inmates held in the Protective Custody Unit in the past.

There is no dispute that Meyers's physical infirmities place him at a great disadvantage were he to be assaulted by another inmate. There also is no dispute that Meyers has told, or attempted to tell, anyone and everyone at Red Onion about Thomas's and Runren's continuing threats to harm him. Both Assistant Warden

Kiser and Defendant Swiney admitted that Meyers had informed them of Thomas's and Runren's threats toward him prior to his filing suit. Despite these threats, the uncontradicted evidence also shows that, at the time of the filing of Meyers's Complaint, Thomas and Runren still had access, on occasion, to assault Meyers. In particular, each witness who testified confirmed that, on occasion, the lower tier cell doors in the Protective Custody Unit are opened for those inmates to come out of their cells to travel to the building vestibule to receive their medications, while upper tier inmates are present in the pod for indoor recreation. Also, it is uncontradicted that, on occasion, Thomas and Runren have been placed in cells on the same tier with Meyers, which means they have access to him while the tier participates in recreation. It also is uncontradicted that no "keep separate" order has been entered to protect Meyers from Thomas or Runren. While Thomas or Runren had not assaulted Meyers before he filed his Complaint, they had assaulted other inmates housed in the Protective Custody Unit previously.

## PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

> Meyers was under imminent danger of serious physical injury at the time he filed his Complaint.

## RECOMMENDED DISPOSITION

For the reasons stated above, I recommend that the court find that Meyers

was under imminent danger of serious physical injury at the time he filed his Complaint and grant his application to proceed in forma pauperis.

### **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file written objection to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record and unrepresented parties.

**DATED**: This 10th day of October, 2018.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE